**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FAIR HOUSING JUSTICE CENTER, INC., | **Case No. 26-CV-** |
| *Plaintiff*, | |
| v. | **COMPLAINT** |
| WYTON DEVELOPERS, LLC, 2711 FULTON LLC, 2667 FULTON MBR LLC, ASCO MANAGEMENT LLC, and NIKOLAI KATZ ARCHITECT, | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

Plaintiff Fair Housing Justice Center, Inc. ("FHJC"), by and through its attorneys Eisenberg & Baum, LLP, states its Complaint against Defendants 2711 Fulton LLC, 2667 Fulton MBR LLC, Asco Management LLC, Nikolai Katz Architect, and Wyton Developers, LLC:

### INTRODUCTION

1. Inaccessible buildings invoke a history of exclusion and have no place in the nation's largest city, especially when design and construction guidelines have been on the books for decades. Defendants cannot flout these laws with abandon.

2. FHJC is a non-profit organization that ensures that all people, including people with mobility disabilities, have equal access to housing in New York City and surrounding counties.

3. Defendants are involved in the ownership, management, and leasing of Cypress Park and/or The Agora, apartment buildings in Brooklyn, NY (together, the "Subject Properties"). Testing by the FHJC revealed that Defendants' buildings are inaccessible to New Yorkers with physical disabilities. Specifically, Defendants discriminate against both prospective and current residents with mobility disabilities by failing to ensure the accessibility of their housing units and common areas, thereby denying these individuals equal access to Defendants' housing and

1

services.

4.      FHJC's fair housing testers ("Testers") revealed numerous accessibility barriers at the Subject Properties. Outdoor areas, such as private balconies and shared roof spaces, are only accessible by stairs, effectively denying individuals with mobility disabilities the use and enjoyment of these amenities. For instance, Cypress Park's roof deck has a step-up to enter the roof that exceeds the accessibility standards of unbeveled thresholds, and when entering the roof deck, there is a 12-inch steeply sloped incline with no handrails; there was no other route to access the roof deck.

5.      Defendants failed to ensure that common areas—the building's lobby, mailroom, refuse room, roof deck, laundry room, co-working space, screening room, and bike room—provide accessible routes for individuals with physical disabilities.

6.      The testing revealed that garbage chutes outside of the units are inaccessible to individuals with mobility disabilities, making it difficult or impossible for such residents to dispose of trash independently.

7.      Units also fail to comply with accessibility standards set by the United States Department of Housing and Urban Development ("HUD"), significantly limiting the ability of individuals with disabilities to live independently and equitably access their homes.

8.      Despite these barriers, Defendants have not made the necessary modifications or implemented policies to address the inaccessibility of the Subject Properties, even though city, state, and federal law have long mandated accessible housing for people with physical disabilities. Defendants' continued failure to provide an accessible housing environment perpetuates systemic discrimination against individuals with mobility disabilities.

9.      Defendants willfully disregard their legal obligations to design and construct buildings with accessibility features. As a direct consequence, Defendants' residential housing is

unavailable to people with physical disabilities.

10.   Plaintiff seeks to stop the unlawful practices that Defendants have perpetuated.

11.   Accordingly, Plaintiff brings this lawsuit to compel Defendants to cease their unlawful discriminatory practices and to implement policies, procedures, and physical alterations to ensure accessibility, full and equal enjoyment, and a meaningful opportunity for individuals with mobility disabilities to reside in and benefit from Defendants' housing and services. Plaintiff seeks declaratory, injunctive, and equitable relief; compensatory and punitive damages; and attorney's fees and costs to redress Defendants' unlawful disability discrimination in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq*.; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290, *et seq.;* and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq*.

## JURISDICTION AND VENUE

12.   This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C § 3613 because this action involves federal questions regarding the deprivation of Plaintiff's rights under the federal Fair Housing Act. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's related claims arising under New York state and city law.

13.   Venue is properly lodged in this District pursuant to 28 U.S.C. § 1391(b) because Defendants' acts of discrimination occurred in this District and the underlying buildings that are the subject of this action are located in this District.

## THE PARTIES

14.   FHJC is a non-profit organization dedicated to ensuring that all people have equal access to housing opportunities in the greater New York City region by eliminating housing discrimination and creating open and inclusive communities. FHJC's principal office is located in

3

the Eastern District of New York.

15.   To this end, FHJC (a) provides information to the public and other nonprofit organizations in the New York City regional area about fair housing laws; (b) provides intake counseling to individuals and organizations regarding allegations of housing discrimination; (c) operates a fund to assist low- and moderate-income people with disabilities in retrofitting their homes with necessary accessibility modifications; (d) conducts testing and other investigations of allegations of housing discrimination; (e) makes legal referrals to cooperating attorneys; and (f) provides post-referral litigation support services. FHJC provides these services free of charge.

16.   To further its mission of promoting equal housing opportunities for people with disabilities, FHJC engages in a number of additional activities, including helping individuals request reasonable accommodations or reasonable modifications and administering a housing accessibility fund that provides assistance to renters who need reasonable modifications to their housing to make it accessible.

17.   For individuals who need reasonable accommodations or modifications, FHJC helps them draft such requests, obtain related information such as medical support letters, document housing providers' responses, and provide information about options if the request is denied.

18.   For individuals who require financial assistance with reasonable modifications and may be assisted by the Adele Friedman Housing Accessibility Fund (the "Fund"), FHJC guides such individuals through the application process, works with cooperating architects, and acts as project manager, retaining architects and contractors as needed, communicating with housing providers about coverage of projected costs, and negotiating with housing providers over payment for costs and related contracts

19.   FHJC has created the Fund for the purpose of providing financial assistance to

4

persons with physical disabilities within the FHJC's service area who need reasonable modifications made to their existing housing to make it accessible.

20.    FHJC employs staff to assist residents within its service area to make reasonable accommodation and modification requests to their landlords, condo and cooperative boards, and/or in other multi-family housing to make their housing more accessible on a case-by-case basis, even though fair housing laws require new housing construction to meet certain minimum accessibility criteria—precisely to avoid the need to modify buildings and units one at a time. FHJC staff review each individual's eligibility for reasonable accommodations and/or modifications through an intake counseling process; help individuals obtain medical support, if needed, for their requests; assist in drafting and making requests; and oversee the implementation of any approved requests, including inspecting retrofits after work is completed to ensure the resident's needs are met, and, where required, coordinate the removal of modifications after a resident moves out of a rental unit.

21.    Since many residents within FHJC's service area are not aware of their right to seek modifications in multi-family buildings or of FHJC's services, FHJC staff conducts outreach to and builds ongoing partnerships with nonprofit organizations with clients with disabilities to inform them of their rights and of the ways the FHJC can assist them, including by helping them secure necessary modifications to their inaccessible dwellings.

22.    FHJC recruits and compensates architects to evaluate a person's dwelling, propose necessary modifications, and provide a written proposal for the proposed modifications for a landlord or condo/co-op board. Through the Fund, the FHJC also pays for those modifications where a landlord or condo/co-op board is not required by law to pay for them and the resident is moderate- or low-income.

23.    FHJC also conducts testing investigations for government law enforcement agencies, provides technical assistance to nonprofit organizations engaging in fair housing

5

enforcement activities, and engages in policy initiatives that further the FHJC's mission, including the publication and dissemination of reports and educational materials.

24.    Federal, state, and local fair housing laws are intended to create open, inclusive, and accessible communities.

25.    In its twenty years of operation, FHJC continues to find that the accessibility requirements of these laws regarding reasonable accommodations and modifications and new construction are not fully complied with by entities like Defendants, which have designed and constructed inaccessible housing.

26.    Defendants' ongoing and continuing failures to comply with these laws impair the FHJC's core activities and its ability to accomplish its mission of creating open, inclusive, and accessible housing by reducing the supply of accessible and adaptable housing.

27.    Defendants frustrated FHJC's mission to ensure that all people have equal access to housing opportunities in New York by, among other things, making their housing facility inaccessible to individuals with disabilities. If Defendants, complied with the accessibility requirements of federal, state, and local fair housing, the need for these services would be reduced and FHJC's ability to accomplish its mission of creating accessible communities would not be thwarted. In other words, Defendants would not cause the FHJC any injury if they followed the law.

28.    FHJC staff create and disseminate consumer fact sheets and other information on its website and through social media, especially since many residents within FHJC's service area are not aware of their right to seek housing modifications or of FHJC's services. FHJC staff also make in-person and virtual presentations to educate the public and social service organizations that serve people with disabilities about accessibility requirements for new construction.

29.    FHJC also provides periodic training for architects and developers on accessibility

6

requirements for new construction, even though these standards were first adopted by Congress in 1989, more than 35 years ago.

30. Through its multi-faceted work, FHJC has consistently found that developers, landlords, architects, and contractors like the Defendants in this case are not fully complying with the accessibility requirements of federal, state, and local fair housing laws regarding reasonable accommodations, modifications, and new construction. This lack of compliance has created thousands of inaccessible multi-family dwelling units in New York City, including the Subject Properties, which were designed and constructed by Defendants decades after the requirements of these laws went into effect in 1991.

31. These ongoing and continuing failures to comply with laws intended to create open, inclusive, and accessible communities consistent with FHJC's mission injure and impair FHJC's core activities and its ability to accomplish its mission. For example, when developers, landlords, architects, and contractors such as Defendants design and construct inaccessible housing, the FHJC's employees continue to face housing discrimination, the Fund is impacted by the need to retrofit more housing, and the FHJC's resources are drained. The construction of inaccessible housing also contradicts the education and outreach the FHJC does about accessible housing. FHJC tells the public, including people with disabilities and non-profits that support them, that housing constructed since 1991 is built accessibly, yet Defendants continue to build and offer new housing that is not accessible. To address this disconnect, the FHJC is forced to devote resources to ensuring new housing is, in fact, built accessibly.

32. FHJC employs "Testers," who are individuals who pose as prospective renters, home buyers, residents, and the like for the purpose of obtaining information about the conduct of local governments, landlords, real estate agents, companies, and others to determine if illegal housing discrimination is taking place.

7

33. Before participating in a testing investigation coordinated by FHJC, the testers receive training from FHJC regarding, among other things, taking measurements and preparing tester report forms.

34. FHJC has expended staff time and other resources to investigate and respond to Defendants' discriminatory practices, which has diverted resources away from other FHJC activities and the communities it serves. Indeed, Defendants' actions thwart FHJC's ability to accomplish its mission of creating accessible communities.

35. Cypress Park is an apartment building located at 2715 Fulton Street, Brooklyn, NY 11207 ("Cypress Park"). Its final Certificate of Occupancy was issued January 27, 2025.

36. The Agora NYC is an apartment building located at 2667 Fulton Street, Brooklyn, NY 11207. A temporary Certificate of Occupancy was issued on January 20, 2026; a final Certificate of Occupancy has not yet been issued.

37. Defendant 2711 Fulton LLC is the owner, lessor, and/or operator of Cypress Park. Defendant is a New York domestic limited-liability company doing business in this judicial district, with its principal place of business located at 185 Marcy Avenue, Brooklyn, NY 11211.Defendant 2711 Fulton LLC is subject to the requirements of the FHA, NYSHRL, and NYCHRL.

38. Defendant 2667 Fulton MBR LLC is the owner, lessor, and/or operator of The Agora. This Defendant is a New York domestic limited-liability company doing business in this judicial district, with its principal place of business located at 185 Marcy Avenue, Brooklyn, NY 11211. Defendant 2667 Fulton MBR LLC is subject to the requirements of the FHA, NYSHRL, and NYCHRL.

39. Defendant Wyton Developers LLC is the owner, lessor, and/or operator of the Subject Properties. This Defendant is a New York domestic limited-liability company doing

business in this judicial district, with its principal place of business located at 199 Lee Avenue, Suite 487, Brooklyn, NY 11211. Defendant Wyton Developers LLC is subject to the requirements of the FHA, NYSHRL, and NYCHRL.

40.    Defendant Asco Management LLC is the manager, lessor, and/or advertiser of the Subject Properties. Defendant is a New York domestic limited-liability company doing business in this judicial district with a registered agent for service c/o File It USA Inc., P.O. Box 241, Albany, NY 12201. Defendant Asco Management LLC is subject to the requirements of the FHA, NYSHRL, and NYCHRL.

41.    Defendant Nikolai Katz Architect is the architect of the Subject Properties. Defendant Nikolai Katz Architect is subject to the requirements of the FHA, NYSHRL, and NYCHRL.

42.    Defendants owned, designed, constructed, and/or otherwise participate in the development of Cypress Park and/or The Agora, which violates of city, state, and federal accessibility requirements.

43.    Each Defendant participated in the design and construction process for Cypress Park and/or The Agora, upon information and belief, was able to exercise sufficient control and/or authority to undertake to remedy Cypress Park and/or The Agora or otherwise to make Cypress Park and/or The Agora accessible to people with disabilities and/or compliant with applicable accessibility laws. Consequently, each Defendant had an independent, nondelegable duty to comply with the accessibility requirements of the fair housing laws.

## STATEMENT OF FACTS

### Statutory and Regulatory Framework

44.    In 1988, Congress enacted comprehensive amendments to the Fair Housing Act, effectuating design and construction accessibility requirements to prohibit discrimination on the

basis of disability. Legislative history shows congressional intention to reflect the "clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps[1] from the American mainstream." H.R. Rep. No. 100-711.

45.    When doing so, Congress aptly described the discriminatory effect created by architectural barriers that prevent the use and enjoyment of a dwelling: "A person using a wheelchair is just as effectively excluded from the opportunity to live in a particular dwelling by the lack of access into a unit and by too narrow doorways as by a posted sign saying 'No Handicapped People Allowed.'" *Id.*

46.    Poorly designed and constructed buildings often exclude people with physical disabilities, including those who use wheelchairs. To remedy that, the FHA mandates that multi-family residential buildings containing four or more units and built for first occupancy after March 13, 1991 ("covered multifamily dwellings") meet certain design and construction requirements. According to 42 U.S.C. § 3604(f)(3), covered multifamily dwellings must provide, among other things:

a) at least one accessible building entrance on an accessible route;

b) accessible and usable public- and common-use areas, which include all parts of the building beyond the individual units;

c) doors designed to allow passage into and within all premises in such dwellings that are sufficiently wide to allow passage by persons using wheelchairs;

d) an accessible route into and through each dwelling;

e) light switches, electrical outlets, thermostats, and other environmental controls in

---

[1] The term "disability" is generally more accepted, and this Complaint uses the two terms interchangeably because they carry the same legal meaning. *See Bradgon v. Abbott*, 524 U.S. 624, 631 (1998).

accessible locations;

f) reinforcements in bathroom walls that allow for the later installation of grab bars; and

g) usable kitchens and bathrooms such that a person using a wheelchair can maneuver about the space.

47.    To give meaning to the FHA design and construction requirements, HUD promulgated the final FHA design and construction regulations in January 1989. 24 C.F.R. § 100.205. HUD published the final Fair Housing Accessibility Guidelines on March 6, 1991, 56 Fed. Reg. 9472, which incorporate the requirements of the American National Standard for Buildings and Facilities providing accessibility and usability for people with physical disabilities, A117-1-1986; HUD also published the Fair Housing Act Design Manual in August 1996, which was revised in August 1998, and the Accessibility Requirements for Covered Multifamily Dwellings under the Fair Housing Act in April 2013.

48.    With nearly identical language to its federal counterpart, the New York State Human Rights Law prohibits failing to design and construct covered multi-family dwellings in an accessible manner. New York Executive Law, Art. 15 §§ 296(5), (18).

49.    The New York City Human Rights Law likewise prohibits discrimination in housing accommodations. Section 27-292.8 of the NYC Administrative Code contains the accessibility requirements under the New York City Building Code. Sections 8-107(5) and (15) characterize the failure to comply with those accessibility requirements as an unlawful deprivation of the full use and enjoyment of a housing accommodation by individuals with disabilities.

### Inaccessible Features at Cypress Park in March 2024

50.    On March 14, 2024, Tester U.C., under an alias, inquired about a tour of available Cypress Park units through Streeteasy.com.

11

51.     Testers U.C. and A.W. arrived for the appointment and viewed Unit #101, #205, #206, #208, #405, #407, and #701.

52.     They observed that the top row of mailboxes in the mailroom measured 50 inches from the ground to the top keyhole.

53.     This exceeds the required height of 48 inches, violating accessibility standards.

54.     Further, the garbage chute in the building is equipped with a T-bar handle.

55.     T-bar handles are not accessible to individuals with limited hand strength or dexterity. The required accessible hardware for such features must be usable by individuals with disabilities, typically through a U-shaped or other compliant handle design.

56.     The roof deck on the eighth floor is only accessible via a step-up that exceeds the accessibility standards of unbeveled thresholds, with no railings provided for safety or support. Additionally, no alternate accessible route exists to access the roof deck.

57.     This renders the roof deck inaccessible to individuals with mobility disabilities who rely on wheelchairs, walkers, or other mobility devices.

58.     The entrance to the laundry room has a beveled threshold measuring 3 inches high.

59.     The entrance to the co-working space has a beveled threshold measuring 1½ inches high.

60.     The entrance to the screening room has a beveled threshold measuring 2½ inches high.

61.     The entrances to the laundry room, co-working space, and screening room exceed the maximum allowable height for thresholds under accessibility standards. Beveled thresholds cannot exceed 1¼ inches with a 1:2 slope, making these features non-compliant with accessibility requirements.

62.     Further, the entrance to the bike room has four steps, each 6½ inches high.

63.    This height exceeds the height allowed by accessibility requirements, making these steps inaccessible to individuals with mobility disabilities.

64.    The measurements of the interior doors in all apartments fall below the required minimum nominal width for accessibility.

65.    In Unit #205, the door leading to the terrace measured 29 inches wide.

66.    In Unit #208, the door leading to the terrace measured 28 inches wide.

67.    In Unit #405, the door leading to the terrace measured 28 inches wide.

68.    In Unit #801, the door leading to the terrace measured 28 ½ inches wide.

69.    These measurements for all these doors leading to a terrace fall below the required minimum nominal width for accessibility.

**Inaccessible Features at Cypress Park in July 2025**

70.    On July 28, 2025, Tester K.W., who uses a wheelchair and operated under an alias, inquired about a tour of available Cypress Park units through Streeteasy.com.

71.    Testers K.W. and C.V. arrived for the appointment and viewed Unit #205 and #607.

72.    The top row of mailboxes in the mailroom still measured 50 inches from the ground to the top keyhole, exceeding the required height of 48 inches and violating accessibility standards.

73.    The garbage chute in the building is still equipped with a T-bar handle, which is not accessible to individuals with limited hand strength or dexterity.

74.    The entrances to the roof deck, laundry room, and screening room exceed the maximum allowable height for thresholds under accessibility standards.

75.    The entrances to each apartment viewed has a beveled threshold above the maximum height of ¾ inches.

76.    In Unit #607, the door leading to the balcony is unbeveled and measured 1 ½ inches high, exceeding the maximum allowable height of ¼ inches for unbeveled thresholds.

77. In Unit #607, the bedroom and bathroom doors measured 31 ½ inches wide.

78. In Unit #607, the door leading to the terrace measured 28 ¼ inches wide.

79. The measurements for all these doors fall below the required minimum nominal width for accessibility.

80. Likewise, the bedroom and bathroom doors in Unit #205 fall below the required minimum nominal width for accessibility.

81. Tester K.W. noted that in Unit #607, one of the two bathrooms did not have enough space for her to maneuver her wheelchair and close the door behind her.

**Inaccessible Features at Cypress Park in August 2025**

82. On August 5, 2025, Tester J.S., under an alias, was shown two additional apartments at Cypress Park (Unit #203 and #205) after viewing apartments at The Agora through an inquiry on Streeteasy.com (further discussed below).

83. The bathrooms in both units do not appear to have enough clear floor space for accessible maneuvering in the bathroom.

84. In Unit #203, Tester J.S. opened the door approximately 90 degrees and measured 31 ½ inches from the end of the open door to the nearest protruding obstruction and 42 ½ inches from the perpendicular wall to the nearest protruding obstruction.

85. In Unit #205, Tester J.S. opened the door approximately 90 degrees and measured 31 ¼ inches from the end of the open door to the nearest protruding obstruction and 36 ½ inches from the perpendicular wall to the nearest protruding obstruction.

**Inaccessible Features at The Agora in August 2025**

86. As noted above, on August 5, 2025, Tester J.S. inquired about a tour of available units at The Agora through Streeteasy.com.

87. On August 7, 2025, Tester J.S. arrived for the appointment and viewed Unit #110,

#111, and #304

88.  Tester J.S. observed that the thresholds leading to the amenities appear to be unbeveled and more than ¼ inches in height.

89.  Tester J.S. observed that the door thresholds to the apartments appear to have unbeveled thresholds that exceed maximum requirements.

90.  Both bathrooms in Unit #304 do not appear to have enough clear floor space for accessible maneuvering in the bathroom.

91.  In the first bathroom of Unit #304, Tester J.S. opened the door approximately 90 degrees and measures 16 ½ inches from the end of the open door to the nearest protruding obstruction and 59 ½ inches from the perpendicular wall to the nearest protruding obstruction.

92.  In the second bathroom of Unit #304, Tester J.S. opened the door approximately 90 degrees and measures 31 ½ inches from the end of the open door to the nearest protruding obstruction and 32 ½ inches from the perpendicular wall to the nearest protruding obstruction.

93.  On August 14, 2025, Testers K.W. and J.C. viewed Unit #110, #111, and #304 after Tester K.W. had inquired about a tour of available units at The Agora on July 29, 2025.

94.  Tester K.W. observed that excessive force was required to open the entrance door to the building.

95.  The top row of mailboxes in the mailroom measured 49 ½ inches from the ground to the top keyhole, exceeding the maximum height of 48 inches and violating accessibility standards.

96.  The Testers observed that the door leading to the common areas has a vertical door handle that protruded out from the doorway, which narrowed the entrance hallway from 37 inches to 31 inches wide when the door was open, failing to provide the required 36-inch-wide unobstructed route.

97.     The laundry room entrance has an unbeveled threshold measuring 1 1/8 inches in height, far exceeding the ¼-inch maximum. This barrier made it difficult for Tester K.W. to enter the room.

98.     Additional common areas are rendered inaccessible by non-compliant thresholds, including a 1 1/8-inch unbeveled threshold at the laundry room, business room, and co-working space.

99.     The outdoor courtyard space has a 12 ½-inch step-up at its entrance, creating a prohibitive physical barrier because unbeveled thresholds cannot exceed ¼ inches of height.

100.    In addition, the refuse room's garbage chute is equipped with a T-bar handle, which is not accessible to individuals with limited hand strength or dexterity.

101.    Further investigation revealed that many unbeveled thresholds throughout the amenity areas are slanted and not uniformly level, creating additional impediments.

102.    The bathroom in Unit #110 and both bathrooms in Unit #304 fail to provide sufficient clear floor space for maneuverability, denying access to individuals who use wheelchairs like Tester K.W. Tester K.W. was unable to close the door behind her in these bathrooms.

103.    One of the bathrooms the Testers viewed also contains a slanted, 1-inch high unbeveled threshold, further impeding access.

104.    In the bathroom of Unit #110, a tester opened the door approximately 90 degrees and measured 32 inches from the end of the open door to the nearest protruding obstruction and 32 ½ inches from the perpendicular wall to the nearest protruding obstruction.

105.    In the first bathroom of Unit #304, a tester opened the door approximately 90 degrees and measured 32 inches from the end of the open door to the nearest protruding obstruction and 32 ½ inches from the perpendicular wall to the nearest protruding obstruction.

106.    In the second bathroom of Unit #304, Tester J.S. opened the door approximately

90 degrees and measured 17 inches from the end of the open door to the nearest protruding obstruction and 59 inches from the perpendicular wall to the nearest protruding obstruction.

### Allegations as to Both of the Subject Properties

107.    As a direct result of their illegal and discriminatory actions described above, Defendants have injured FHJC by frustrating its mission of creating open and inclusive communities free of discrimination.

108.    Defendants' illegal and discriminatory actions perpetuate unequal housing opportunities in New York City and the surrounding areas and frustrate FHJC's mission by creating inaccessible housing in the buildings that Defendants have developed, designed and/or constructed, thus limiting the supply of accessible and adaptable housing within FHJC's service area.

109.    Defendants have separately injured FHJC by causing FHJC to divert its scarce resources toward investigating, identifying, and counteracting Defendants' discriminatory housing practices. These resources otherwise would have been used to engage in other activities and provide other services, including, among other things, providing information to the public and other non-profit organizations, providing intake counseling services to individuals and organizations, providing post-referral litigation support services, and engaging in policy and education initiatives to promote fair housing. Moreover, Defendants have contributed to the depletion of the Fund by failing to comply with the accessibility requirements of the fair housing laws in their design and construction of Cypress Park, thereby creating more inaccessible housing stock in the New York City area and increasing the need for modifications to such housing.

### Defendants' Ongoing Pattern and Practice of Unlawful Design and Construction of Residential Housing

110.    The inaccessible features are similar across the Subject Properties, including

inaccessible mailboxes and environmental controls at each of the buildings, and consistently inaccessible thresholds and clearances. That these Subject Properties all developed within a few years of each other and have many of the same barriers to access indicates that Defendants, their related entities, and the design-and-construction professionals engaged to build the Subject Properties, have a regular practice of designing and constructing multi-family residential dwellings in the city and state of New York that do not comply with the accessibility requirements of the FHA, the NYSHRL, or the NYCHRL.

111.    Upon information and belief, Defendants' continued development of buildings within FHJC's geographical reach raises a concern that current and future projects will not comply with the accessibility requirements of federal, state, and local fair housing laws.

## FIRST CAUSE OF ACTION

Fair Housing Act, 42 U.S.C. § 3604(f)(3)(C)
Against All Defendants

112.    Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

113.    The Subject Properties are each a "covered multi-family dwelling" as defined by 42 U.S.C. § 3604(f)(7).

114.    Defendants own and lease dwellings within the meaning of 42 U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

115.    The FHA provides that it is illegal "to discriminate against any person in the terms, conditions, privileges of sale or rental of a dwelling or in the provision of services or facilities in connection with such dwelling," because of disability. 42 U.S.C. § 3604(f)(2).

116.     Further, Defendants have failed to comply with the accessibility requirements set forth in the FHA by failing to ensure the accessibility of common areas, thresholds, balconies,

trash chutes, light switches, and more. 42 U.S.C. § 3604(f)(3)(C).

117. Defendants discriminated on the basis of disability in violation of the above-cited provisions of the FHA.

118. Plaintiff is an aggrieved person within the meaning of 42 U.S.C. § 3602(i), has been injured by Defendants' discriminatory conduct, and has suffered damages, including diversion of resources and frustration of mission, as a result.

119. Accordingly, Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to the FHA. 42 U.S.C. § 3613(c).

## SECOND CAUSE OF ACTION

New York State Human Rights Law, N.Y. Exec. Law § 296(5), (18)
Against All Defendants

120. Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

121. At all times relevant to the action, the New York Human Rights Law, Article 15 of the New York Executive Law § 290, *et seq.* has been in full force and effect and has applied to Defendants' conduct.

122. Plaintiff is a person as defined by New York Executive Law § 292(1).

123. At all times relevant to the action, Defendants have been housing accommodations within the meaning of N.Y. Exec. L. § 292(10).

124. Defendants' design and construction of inaccessible housing constitutes unlawful discrimination against people with disabilities, under New York Executive Law §§ 296(5), (18).

125. As a direct and proximate result of Defendants' failure to design and construct the Subject Properties in compliance with the accessibility requirements of the NYSHRL, Plaintiff has suffered damages.

126. Defendants' failure to design and construct the Subject Properties in compliance

with the accessibility requirements of the NYSHRL was intentional, willful, or with reckless disregard.

127.    Despite being aware of the accessibility needs of prospective tenants and their obligations under the law, Defendants have failed to modify or adjust these non-compliant features or provide alternative accessible routes, in violation of the NYSHRL.

128.    Defendants have failed to ensure the accessibility of the Subject Properties' common areas and provide accessible features in its residential units in violation of the NYSHRL.

129.    As set forth above, Defendants discriminated against individuals with mobility disabilities on the basis of disability in violation of the NYSHRL. Plaintiff has been injured as a result of Defendants' discriminatory conduct, and has suffered damages, including diversion of resources and frustration of mission.

130.    The NYSHRL extends a cause of action and relief to "any person claiming to be aggrieved" by an unlawful discriminatory practice. N.Y. Exec. L. § 297(9).

131.    Plaintiff is therefore entitled to injunctive relief, punitive damages, attorneys' fees, and compensatory damages for the injuries and loss sustained as a result of Defendants' discriminatory conduct as hereinbefore alleged pursuant to N.Y. Exec. L. §§ 297(9), (10).

### THIRD CAUSE OF ACTION

New York City Human Rights Law, N.Y. Admin. Code § 8-107(5)
Against All Defendants

132.    Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

133.    At all times relevant to this action, the NYCHRL, N.Y.C. Admin. Code § 8-101 *et seq.*, has been in full force and effect and has applied to Defendants' Subject Properties.

134.    Plaintiff is "person" and a "person aggrieved" by Defendants' unlawful practices as defined by New York City Administrative Code § 8-102.

135.    At all times relevant to this action, Defendants' the Subject Properties have each been a "housing accommodation" within the meaning of N.Y.C. Admin. Code § 8-102(10).

136.    The New York Court of Appeals has recognized that "the NYCHRL was intended to be more protective than the state and federal counterparts . . . with the aim of making it the most progressive in the nation." *Makinen v. City of N.Y.*, 30 N.Y.3d 81, 88 (N.Y. 2017) (cleaned up). In *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62 (1st Dep't 2009), for example, the Appellate Division "adopt[ed] a new . . . standard for determining liability" in favor of a new standard "that 'is most faithful to the uniquely broad and remedial purposes of [the statute]'"—even "without any input from the parties concerned." *Id.* at 83 (Andrias, J., concurring); *see also id.* at 78. The majority opinion in *Williams* was one of three opinions ratified by the Restoration Act as having "correctly understood and analyzed the liberal construction requirement of . . . [8-130] and that have developed legal doctrines accordingly that reflect the broad and remedial purposes of [the NYCHRL]." N.Y.C. Admin. Code § 8-130(c).

137.    Defendants designed and constructed the Subject Properties in violation of the accessibility requirements found in New York City Administrative Code § 27-292. By doing so, Defendants are discriminating in the furnishing of facilities or services in connection with housing accommodations based on disability in violation of New York City Administrative Code § 8-107(5)(a)(2).

138.    As a direct and proximate result of Defendants' failure to design and construct the Subject Properties in compliance with the accessibility requirements of the NYCHRL, Plaintiff has suffered damages.

139.    Defendants' failure to design and construct the Subject Properties in compliance with the accessibility requirements of the NYCHRL was intentional, willful, or with reckless disregard.

140. As set out above, absent injunctive relief, there is a clear risk that Defendants' actions will continue to occur and continue to frustrate Plaintiff's mission.

141. Plaintiff is therefore entitled to seek and recover compensatory damages for the injuries and loss sustained as a result of Defendants' discriminatory conduct, including diversion of resources and frustration of mission, as hereinbefore alleged pursuant to N.Y.C. Admin. Code § 8-502(a).

142. Plaintiff is further entitled to an award of punitive damages pursuant to N.Y.C. Admin. Code § 8-502(a).

143. Plaintiff is further entitled to an award of attorney's fees, costs, and disbursements pursuant to N.Y.C. Admin. Code § 8-502(g).

144. Plaintiff has caused to be served a copy of this Complaint upon the City Commission on Human Rights and Corporation Counsel, pursuant to New York City Administrative Code § 8-502(c).

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully prays that this Court grant the following relief:

A. Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' policies, procedures, and practices have subjected Plaintiff to unlawful discrimination in violation of the FHA, the NYSHRL, and the NYCHRL.

B. Enjoin Defendants and their agents, employees, and successors, and all other persons in active concert or participation from discriminating on the basis of disability, including the following:

i. Making, printing, or publishing, or causing to be made, printed, or published a notice, statement, or advertisement, with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination;

22

ii.      Representing to any person that a dwelling is not available for inspection or rental when such dwelling is in fact available;

iii.      Denying or withholding housing or otherwise making housing unavailable on the basis of disability;

iv.      Discriminating in the terms, conditions, or privileges of Defendant's housing and/or services;

v.      Refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford equal opportunity to use and enjoy a dwelling;

vi.      Refusing to administer programs in a manner that does not discriminate against people with disabilities;

vii.      Refraining from inquiring about a potential resident's use of a wheelchair or other assistive mobility devices during the application process, including during the site tour or in the application materials; initial telephone inquiries, tours, meetings or other informal interactions occurring before an assessment that is intended to develop a plan of care and determine any necessary accommodations or modifications; and

viii.      Using criteria or methods of administration, the purpose or effect of which would defeat or substantially impair the accomplishment of the objectives of their federally assisted program or activity for qualified individuals with a particular disability.

ix.      Discriminating against persons with disabilities in the design and/or construction of all covered multi-family residential properties;

C.      Order Defendants:

i.      to make all necessary modifications to their policies, practices, and procedures to comply with the FHA, the NYSHRL, and the NYCHRL;

ii.    to modify the Subject Properties to ensure compliance with accessibility standards, including but not limited to removing physical barriers, modifying thresholds, installing accessible hardware, and ensuring that common areas are accessible to individuals with a wide range of disabilities;

iii.    to develop, implement, promulgate, and comply with a policy prohibiting future discrimination against individuals with disabilities by failing to provide appropriate auxiliary aids and services to ensure meaningful access;

iv.    to develop, implement, promulgate, and comply with a policy to ensure that Defendants will notify individuals with disabilities of their right to reasonable accommodation, reasonable modification, and fair housing practices;

v.    to train all their employees, staff, and other agents on a regular basis about the rights of individuals with disabilities under the FHA, the NYSHRL, and the NYCHRL;

vi.    to implement a program of testing Defendants' employees, staff, and other agents to determine whether they are complying with the requirements of the FHA, the NYSHRL, and the NYCHRL;

vii.    to use human models on websites and in other marketing materials that depict residents with mobility disabilities, including residents who use wheelchairs;

viii.    to allow monitoring of their application, admission and retention process;

ix.    to retain advertising, application, admission, and retention records to allow for appropriate monitoring; and

x.    to submit any changes to Defendant's policies for FHJC and court approval.

D.    Award such damages to Plaintiff FHJC as will fully compensate for the diversion of resources and frustration of mission caused by Defendants' unlawful practices.

E.    Award to Plaintiff:

i.      Compensatory damages;

ii.     Punitive damages pursuant to the FHA and the NYCHRL;

iii.    Nominal damages;

iv.     Reasonable costs and attorneys' fees;

v.      Interest on all amounts at the highest rates and from the earliest dates allowed by law; and

vi.     Any and all other relief that this Court finds necessary and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial on the merits by jury pursuant to Fed. R. Civ. P. 38.

Dated: March 12, 2026                        Respectfully submitted,

                                             /s/ David John Hommel, Esq.
                                             David John Hommel, Esq.
                                             Andrew Rozynski, Esq.
                                             EISENBERG & BAUM, LLP
                                             24 Union Square East, Penthouse
                                             New York, NY 10003
                                             Tel: (212) 353-8700
                                             Fax: (917) 591-2875
                                             dhommel@eandblaw.com
                                             arozynski@eandblaw.com
                                             *Attorneys for Plaintiff*